## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---------------------------------------------------------------

RARITAN BAYKEEPER, INC. (d/b/a NY/NJ
BAYKEEPER),
             Plaintiff,

v.

DEPENDABLE IRON & METAL CO., INC.; JOHN
ROTELLA; and DOMINICK ROTELLA,
             Defendants.

---------------------------------------------------------------

Case No. __25-18564__

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF AND
CIVIL PENALTIES**

(Federal Water Pollution Control
Act, 33 U.S.C. §§ 1251 to 1387)

Plaintiff Raritan Baykeeper, Inc., by and through its counsel, hereby alleges:

## I.    INTRODUCTION

1.    This action is brought by Plaintiff Raritan Baykeeper, Inc. (d/b/a NY/NJ

Baykeeper), 1222 Route 36, Suite 4, Hazlet NJ 07730 ("Baykeeper"), against Defendants

Dependable Iron & Metal Co., Inc., P.O. Box 1012, Rahway NJ 07065, and John Rotella and

Dominick Rotella, 95 Rodgers Street, Avenel NJ 07001, (collectively, "Defendants") to address

and abate Defendants' ongoing and continuous violations of the Federal Water Pollution Control

Act, 33 U.S.C. § 1251 *et seq.* ("Clean Water Act" or "CWA").

2.    Defendants discharge industrial stormwater from a scrap metal processing facility

located at Block 772.02, Lots 618 and 7 (mailing address 95 Rodgers Street), in Avenel NJ

07001 (the "Facility") into the South Branch of the Rahway River in violation of the Clean

Water Act, §§ 301(a), 402(p), 33 U.S.C. §§ 1311(a), 1342(p), and the New Jersey Department of

Environmental Protection ("DEP") New Jersey Pollution Discharge Elimination System

("NJPDES") Scrap Metal Processing and Recycling Industrial Stormwater General Permit,

Permit No. NJ0163261 (July 25, 2013) (the "Scrap Metal Permit").

3.    Defendants' violations of the Scrap Metal Permit and the Clean Water Act include: discharges of industrial stormwater that are not authorized by the Scrap Metal Permit; inadequate pollution control measures; inadequate pollution prevention and stormwater control plans; failures to adequately inspect the Facility; and failures to mitigate the harms of their noncompliance.

4.    Stormwater runoff is one of the most significant sources of water pollution in the nation—comparable to, if not greater than, contamination from industrial and sewage sources. With every rainfall event, hundreds of millions of gallons of polluted stormwater pour into the South Branch of the Rahway River and other waters in this District. The State of New Jersey has designated more than 18,000 river miles, 46,000 acres of larger waterbodies, and 630 square miles of bays and estuaries in the State as "impaired," or not meeting water quality standards, and unable to support beneficial uses such as fish habitat and water contact recreation. Under the Clean Water Act, "impaired" means not meeting a state's water quality standards and/or unable to support beneficial uses, such as fish habitat and water contact recreation. In many of these waters, state water quality standards for metals, oil and grease, nutrient enrichment and oxygen depletion, inorganic pollutants, pathogens, taste, color, odor, and other parameters are consistently exceeded. For the overwhelming majority of water bodies listed as impaired, stormwater runoff is cited as a primary source of the pollutants causing the impairment.

5.    Defendants' stormwater discharges contribute to this endemic stormwater pollution problem. Defendants engage in industrial activities outdoors, such as the purchase, collection, processing, storage, reshipment, and resale of scrap metal and the operation and storage of industrial equipment. The Facility has exposed and continues to expose industrial pollutants to stormwater, at a minimum, by: (a) the crushing, processing, recycling, and storing

2

of scrap metal, vehicles, and other recyclable wastes; (b) storing waste materials outdoors; and (c) maintaining and storing machinery and related parts outside and otherwise exposing them to the elements. Whenever precipitation comes into contact with pollutants generated by these industrial activities, it conveys those pollutants to nearby waters.

6.    Stormwater discharges flow from the Facility into the South Branch of the Rahway River. Contaminated stormwater discharges such as those from the Facility can and must be controlled to the fullest extent required by law to preserve and improve the condition of these waters.

## II.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over the parties and this action pursuant to the Clean Water Act, § 505(a)(1), 33 U.S.C. § 1365(a)(1) (the citizen suit provision of the CWA), and 28 U.S.C. § 1331 (an action arising under the laws of the United States). The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

8.    On October 8, 2025, Baykeeper provided notice of Defendants' violations of the Clean Water Act and of Baykeeper's intention to file suit against Defendants ("Notice Letter") to the Defendants and Defendants' registered agents; the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region II; and the Commissioner of the DEP, as required by the Act under Section 505(b)(1)(A), 33 U.S.C. § 1365(b)(1)(A), and its implementing regulations, 40 C.F.R. §§ 135.1–135.3. A true and correct copy of Baykeeper's Notice Letter is attached to this Complaint as Exhibit A and is incorporated herein by reference.

9.     More than sixty days have passed since the Notice Letter was served on Defendants and the State and federal agencies. Baykeeper has complied with the Clean Water Act's notice requirements under Section 505(b)(1), 33 U.S.C. § 1365(b)(1).

10.     Neither the EPA nor the State of New Jersey has commenced or is diligently prosecuting a civil or criminal action to redress the violations alleged in this Complaint. *See* CWA § 505(b)(1)(B), 33 U.S.C. § 1365(b)(1)(B).

11.     This action is not barred by any prior administrative penalty action under CWA Section 309(g), 33 U.S.C. § 1319(g).

12.     Venue is proper in the United States District Court for the District of New Jersey pursuant to CWA Section 505(c)(1), 33 U.S.C. § 1365(c)(1), and 28 U.S.C. § 1391(b)(2) because the source of the violations is located within this judicial district.

## III.    PARTIES

13.     Plaintiff Raritan Baykeeper, Inc., doing business as NY/NJ Baykeeper, is a non-profit corporation, whose mission is to protect, preserve, and restore the ecological integrity and productivity of the Hudson-Raritan Estuary through enforcement, field work, and community action. Baykeeper's mission includes safeguarding the environmental, recreational, and commercial integrity of the Hudson-Raritan Estuary and its ecosystem, including the watersheds of the Raritan Bay and Lower Raritan River. Baykeeper achieves its mission through public education, advocacy for sound public policies and participation in legal and administrative forums. To further its mission, Baykeeper actively seeks federal and state implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

14.     Baykeeper has at least 350 members in the New York and New Jersey region, many of whom use and enjoy the waters of the Hudson-Raritan Estuary and its tributaries—including the South Branch of the Rahway River, which is polluted by industrial stormwater runoff from Defendants' Facility.

15.     Baykeeper's members reside near to, use, and enjoy the waters that Defendants are polluting. Baykeeper's members use those areas to fish, crab, sail, boat, canoe, kayak, swim, birdwatch, photograph, observe wildlife, study nature and the sciences, and engage in spiritual and religious practices, among other activities. Defendants' discharges of stormwater associated with industrial activity containing pollutants impair each of those uses. Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and the Scrap Metal Permit.

16.     For example, one Baykeeper member resides about 500 feet from the Rahway River, and has lived on the same street for most of their life. This member has always enjoyed watching local wildlife, but there is less wildlife to watch and enjoy because the waters that the wildlife rely on are polluted. This member works as a professional nature photographer, and specifically takes and sells photographs of the Rahway River and local wildlife. This member's photography business is harmed by water pollution, as there is less wildlife to photograph and there are visible pollutants in the waters that this member enjoys photographing. This member has a deep emotional and spiritual connection to the River and finds solace in spending time outdoors, immersed in nature. This member's knowledge and observations of pollution in the Rahway River and Raritan Bay, including industrial stormwater pollution, saddens them and lessens their enjoyment derived from spending time outdoors. This member is thus harmed by uncontrolled discharges of stormwater from industrial facilities to the Rahway River.

5

17.     The relief sought herein will redress the harms caused to Baykeeper and its members by Defendants' activities. Continuing commission of the acts and omissions alleged herein will irreparably harm Baykeeper and its members, for which harm Baykeeper has no other plain, speedy, or adequate remedy at law.

18.     Baykeeper brings this action on behalf of itself and its members. Baykeeper's interest in reducing Defendants' discharges of pollutants into the South Branch of the Rahway River and requiring Defendants to comply with the requirements of the Scrap Metal Permit are germane to Baykeeper's purposes. Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of Baykeeper.

19.     Defendant Dependable Iron & Metal Co., Inc. is a corporation formed and existing under the laws of the State of New Jersey, with a corporate address of P.O. Box 1012, Rahway NJ 07065.

20.     Defendant John Rotella is registered with the New Jersey Department of Revenue as the President of Defendant Dependable Iron & Metal Co., Inc. Defendant John Rotella is identified in New Jersey tax records as the owner of the real property associated with the Facility. On information and belief, Defendant John Rotella participates in the ownership and operation of Defendant Dependable Iron & Metal Co., Inc.

21.     Defendant Dominick Rotella is registered with the New Jersey Department of Revenue as the Vice President of Defendant Dependable Iron & Metal Co., Inc. Defendant Dominick Rotella is identified as the Facility's contact for permit compliance in Defendant Dependable Iron & Metal Co., Inc.'s filings with the New Jersey Department of Environmental Protection ("DEP"). On information and belief, Defendant John Rotella participates in the ownership and operation of Defendant Dependable Iron & Metal Co., Inc.

22.     On information and belief, Defendants own and operate, or participate in the ownership and operation of, the scrap metal processing facility located at Block 772.02, Lots 618 and 7 (mailing address 95 Rodgers Street), in Avenel NJ 07001 (the "Facility") that is the subject of this Complaint.

23.     On information and belief, Defendant Dependable Iron & Metal Co., Inc has owned and operated, or participated in the ownership and operation of, the Facility since at least October 17, 1995.

24.     On information and belief, Defendants John Rotella and Dominick Rotella have participated in the ownership and operation of the Facility since at least March 2014.

## IV.    STATUTORY AND REGULATORY BACKGROUND

### A.     <u>The Clean Water Act</u>

25.     Congress enacted the Clean Water Act in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." CWA § 101(a), 33 U.S.C. § 1251(a). In furtherance of this goal, the Act provides a comprehensive approach for the regulation of pollution discharged into the waters of the United States.

26.     The Clean Water Act, Section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge complies with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342. A NPDES permit requires dischargers of pollution to comply with various limitations.

27.     NPDES permits are issued by the United States Environmental Protection Agency ("EPA") or by states authorized by EPA to act as NPDES permitting authorities, provided that the state permitting program ensures compliance with the procedural and substantive

requirements of the CWA. CWA § 402(b)(1), 33 U.S.C. § 1342(b)(1); 40 C.F.R. § 123.25(a).

28.    The Clean Water Act requires that any NPDES permit issued by a state must apply and ensure compliance with, among other things, the Act's technology-based standards for discharges of pollution. *See* 33 U.S.C. § 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311).

29.    The Clean Water Act's technology-based standards dictate that, with respect to toxic and non-conventional pollutants, permitted dischargers shall apply "the best available technology economically achievable for such category or class [of permitted dischargers], which will result in reasonable further progress towards the national goal of eliminating the discharge of all pollutants." 33 U.S.C. § 1311(b)(2)(A) (i.e., the "BAT" standard). The Act also sets a different standard, "application of the best conventional pollutant control technology" for a defined set of "conventional pollutants." *Id.* § 1311(b)(2)(E) (i.e., the "BCT" standard) (together, the "BAT/BCT Standard").[1] *See also* 40 C.F.R. § 122.44(a) (requiring that each NPDES permit shall include conditions that meet the Act's technology-based standards).

30.    The Clean Water Act further requires any NPDES permit issued by a state to contain any additional limits necessary to ensure compliance with that state's water quality standards. *See* 33 U.S.C. §§ 1311(b)(2)(c) (requiring achievement of "any more stringent limitation, including those necessary to meet water quality standards"), 1342(b)(1)(A) (requiring compliance with "any applicable requirements" of 33 U.S.C. § 1311). *See also* 40 C.F.R. § 122.44(d) (requiring that each NPDES permit shall include any conditions necessary to achieve a state's water quality standards).

---

[1] "Conventional pollutants" are defined by statute, 33 USC § 1314(a)(4), and by regulation, 40 CFR § 401.16, to include: biochemical oxygen demand, total suspended solids, pH, fecal coliform, and oil and grease.

31.     New Jersey's surface water quality standards set numeric and narrative criteria for different water pollution parameters. See generally N.J.A.C. 7:9B-1.14 (outlining quantitative and qualitative standards, respectively). A waterbody must meet these numeric and narrative criteria in order to support its designated uses. *See id.* 7:9B-1.5.

**B.     New Jersey's General Permit for Discharge of Stormwater Associated with Scrap Metal Processing and Recycling Activity**

32.     In 1987, to better regulate pollution conveyed by stormwater runoff, Congress enacted Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), entitled "Municipal and Industrial Stormwater Discharges."

33.     Pursuant to Clean Water Act Section 402(p), 33 U.S.C. § 1342(p), EPA promulgated stormwater discharge regulations at 40 C.F.R. § 122.26, which cited abundant data showing the harmful effects of stormwater runoff on rivers, streams, and coastal areas across the nation. In particular, EPA found that runoff from industrial facilities contained elevated pollution levels and that, on an annual basis, pollutant levels in stormwater runoff can exceed by an order of magnitude the levels discharged by municipal sewage treatment plants. 55 Fed. Reg. 47990, 47991 (Nov. 16, 1990).

34.     CWA Section 402(p) and EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permits for stormwater discharges "associated with industrial activity."

35.     As a delegated state NPDES permitting agency, DEP has the authority to issue NPDES permits in New Jersey, known as "NJPDES" permits. DEP has elected to issue a statewide general NJPDES permit for industrial stormwater discharges from scrap metal processing and recycling facilities (*i.e.*, the "Scrap Metal Permit," *supra* ¶ 2). DEP also has the authority to issue NJPDES permits for individual applicants.

36.     As a state-issued, delegated NPDES permit, the Scrap Metal Permit requires

9

permittees to use measures that reflect, and prohibit the discharge of pollutants above the level commensurate with, application of the BAT/BCT Standard. The Scrap Metal Permit implements these federal standards by imposing effluent limitations that require permittees to adopt control measures referred to as Best Management Practices ("BMPs") to control or abate the discharge of pollutants from the Facility. BMPs, as defined by New Jersey Administrative Code 7:14A-1.2, are "schedules of activities, prohibition of practices, maintenance procedures, and other management practices to prevent or reduce the pollution of waters of the State," and "methods, measures, or practices selected by an agency to meet its nonpoint source control needs." *See also Technical Manual for Stormwater Permitting*, New Jersey Department of Environmental Protection, February 1999, at p. 3 (explaining the BMPs set forth in the Stormwater Pollution Prevention Plan "operate as limitations and controls on stormwater discharges to prevent stormwater and surface water contamination and are intended to achieve Best Available Technology Economically Achievable (BAT) and Best Conventional Pollutant Control Technology (BCT) under the Clean Water Act.").

37.    Furthermore, as a state-issued, delegated NPDES permit, the Scrap Metal Permit prohibits permittees from causing or contributing to violations of water quality standards. Specifically, permittees are required to comply with water quality criteria set to control toxic pollutants, including but not limited to lead, zinc, and copper. *See* Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(4)(i)); *see also* N.J.A.C. 7:9B-1.14(d), (f), (g) (setting forth New Jersey's water quality criteria for toxic pollutants).

38.    In order to discharge polluted stormwater lawfully in New Jersey, scrap metal facilities must either obtain coverage under the Scrap Metal Permit and comply with its terms or obtain coverage under and comply with an individual NJPDES permit. 33 U.S.C. § 1311(a).

C.    **The Scrap Metal Permit Framework**

39.    The Scrap Metal Permit ensures compliance with federal technology BAT/BCT

Standard and water-quality requirements by imposing a variety of conditions. All of the Scrap

Metal Permit's conditions constitute enforceable "effluent standards or limitations" within the

meaning of the Clean Water Act's citizen suit provision. 33 U.S.C. § 1365(f) (defining

enforceable effluent standards or limitations to include "a permit or condition of a permit issued

under section 1342 of this title").

40.    First, the Scrap Metal Permit establishes eligibility conditions that permittees

must meet to obtain coverage. Scrap Metal Permit, Part II.C.1. Permittees apply for coverage

under the Scrap Metal Permit by submitting an application in accordance with instructions

posted to DEP's Division of Water Quality website. Scrap Metal Permit, Part II.C.2.

41.    When submitting an application for coverage, the applicant must identify the

specific outfalls through which it will discharge industrial stormwater. *See NJPDES Permit*

*Application*, DEP DIV. WATER QUALITY, Form No. NJPDES-1, at 2 (last revised Dec. 16, 2024),

*available via Permits, Application Forms, & Checklists*, DEP DIV. WATER QUALITY,

https://dep.nj.gov/dwq/permitting_information/permits_application_forms_and_checklists/#DST

(last updated Nov. 10, 2025) (applicant is instructed to provide detail regarding "each discharge

which is the subject of this application"); *see also* Scrap Metal Permit, Part II.C.3.c (requiring

permittee to submit updated information to DEP if the most recent application is no longer

accurate).

42.    A permittee may thus only lawfully discharge stormwater associated with

industrial activity from the outfalls identified in its application for coverage. *Id.*, Part II.B.6

("The permittee shall discharge stormwater to surface waters and/or ground waters of the State

only as authorized herein and consistent with the terms and conditions of this permit.").

11

43.     Next, the Scrap Metal Permit sets forth a variety of effluent limitations that all permittees must meet. These include narrative effluent limitations on pollutants and narrative effluent limitations that impose mandatory BMPs. *See id.*, Parts IV.C–E.

44.     As noted above, the Scrap Metal Permit also imposes narrative and numeric effluent limitations by requiring compliance with water quality criteria set to control toxic pollutants. *See id.*, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(4)(i)).

45.     Permittees typically meet the Scrap Metal Permit's applicable technology and water-quality based effluent limitations (whether those limits are phrased narratively or numerically) by adopting site-specific BMPs in addition to the mandatory BMPs required by the Scrap Metal Permit, including but not limited to BMPs specifically recommended in the Scrap Metal Permit. *See id.*, Part IV.H. These BMPs include changes to industrial practices and activities (*e.g.*, housekeeping schedules and employee training) and structural improvements (*e.g.*, roofing to minimize exposure of pollutants to stormwater, or collection basins that reduce the volume of stormwater discharged from the facility). The permittee must select, design, install, and implement BMPs in accordance with good engineering practices to meet the effluent limits contained in the Scrap Metal Permit. *See generally id.*, Parts IV.A.1, F.

46.     The permittee must record the BMPs used to meet the Scrap Metal Permit's effluent limits in a Stormwater Pollution Prevention Plan ("SPPP"), which must include a Drainage Control Plan ("DCP") that sets forth measures to control stormwater flow within and from their facility. The permittee must develop, implement, and continually update these stormwater pollution control plans. *See id.*, Part IV.B, F.

47.     Further, permittees must track, improve upon, and report upon their performance under the Scrap Metal Permit, which requires regular inspections, monitoring, and sampling of

stormwater discharges; periodic reporting; and corrective action to reduce pollution when necessary. *See id.*, Part IV.G; *see also id.* Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)5, 11, 7:14A-6.5, 7:14A-6.10).

48.     The Scrap Metal Permit also relies centrally on comparing the pollution levels found in a permittee's stormwater discharges to "design criteria," which are pollutant concentrations that, when exceeded, represent a "level of concern." Scrap Metal Permit, Part IV—Notes and Definitions, sub-part A.1.b.ii. The Scrap Metal Permit requires permittees to design, implement, and maintain BMPs to achieve the design criteria and "control or abate the discharge of pollutants." *Id.*, Part IV.G.4.a; N.J.A.C. 7:14A-6.2(b)(1).

49.     As EPA explained in adopting benchmarks for its general permits—which are identical in form and function to the Scrap Metal Permit's design criteria—such indicators "provide a reasonable target for controlling storm water contamination by pollution prevention plans." 60 Fed. Reg. 50804, 51076 (Sept. 29, 1995). Further, exceedances of such indicators can indicate that "a storm water discharge could potentially impair, or contribute to impairing water quality or affect human health from ingestion of water or fish." 60 Fed. Reg. at 50824–25.

50.     Thus, the ability to achieve design criteria provides strong evidence of whether a facility has implemented control measures and BMPs sufficient to constitute compliance with the Scrap Metal Permit and the federal technology BAT/BCT Standard and water-quality based standards that it implements. Since Discharge Monitoring Reports "must be certified by the discharger," they should be treated "as admissions that are sufficient to establish liability under the CWA." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 176 (3rd Cir. 2004).

### D.     <u>Key Conditions of the Scrap Metal Permit</u>

51.     Within the above general framework, the following specific conditions of the Scrap Metal Permit are particularly relevant to this case.

### i.  Mandatory BMPs

52.    The Scrap Metal Permit sets forth multiple categories of mandatory BMPs, including BMPs for scrap metal processing and recycling, BMPs for vehicle recycling, and site-wide BMPs, that permittees must develop, implement, update, and maintain.

53.    First, the permittee must develop, implement, update, and maintain site-specific BMPs for its scrap metal processing and recycling activities. Scrap Metal Permit, Part IV.A.1.b (citing Part IV.C). These mandatory BMPs include the following: a quality control program for inbound scrap metal; a designated area for scrap metal sorting; a controlled area for scrap metal draining and dismantling; unexposed storage for specific scrap metal categories; controlled storage for remaining scrap metal categories; and secondary containment for scrap metal processing equipment and hydraulic equipment. *Id.*, Part IV.B, C.1–6, F, H. More detail on these mandatory BMPs is provided in the Notice Letter attached hereto as Exhibit A, at 8–9, and is incorporated herein by reference.

54.    Second, the Scrap Metal Permit imposes mandatory BMPs for any vehicle recycling activities occurring onsite. *Id.*, Part IV.A.1.b (citing Part IV.D). These mandatory BMPs include the following: an inspection area for inbound vehicles; an unexposed area for vehicle draining and dismantling; controls for vehicle parts storage and vehicle crushers; and controlled storage for processed and operable vehicles. *Id.*, Part IV.D. More detail on these mandatory BMPs is provided in the Notice Letter attached hereto as Exhibit A, at 9–11, and is incorporated herein by reference.

55.    Third, the Scrap Metal Permit requires permittees to institute basic site-wide BMPs. *Id.*, Part IV.A.1.b (citing Part IV.E). These mandatory BMPs include the following: basic housekeeping and sweeping procedures; a controlled fluid storage area; an unexposed area for parts cleaning and solvent degreasing; maintenance of spill kits and appropriate equipment and

materials for spill recovery; and dust and erosion controls, including but not limited to site stabilization. *Id.*, Part IV.E. More detail on these mandatory BMPs is provided in the Notice Letter attached hereto as Exhibit A, at 11–12, and is incorporated herein by reference.

### ii. SPPP Requirements

56.    As noted above, the Scrap Metal Permit requires permittees to record the BMPs and control measures used to meet the Scrap Metal Permit's effluent limitations in a Stormwater Pollution Prevention Plan ("SPPP"). Scrap Metal Permit, Part IV.B.4.a. The permittee must develop the SPPP within six months of the effective date of authorization under the Scrap Metal Permit, and the SPPP must be fully implemented within twelve months of the issuance date of authorization. *Id.*, Part IV.B.1.b. The permittee must develop, implement, and periodically update the SPPP to adapt it to changing conditions at the facility. *Id.*, Part IV.B.2.

57.    The SPPP must identify all potential sources of pollution and source materials on-site and document the practices utilized to minimize or eliminate the exposure of those sources to stormwater, including but not limited to mandatory BMPs and recommended BMPs. *See id.*, Parts IV.B.1.a, 4.a, H.

58.    The Scrap Metal Permit also requires the SPPP to contain a detailed site map, showing, *inter alia*, the location of each area defined by the mandatory BMPs; any fluid storage; any water treatment systems; any implemented or proposed BMPs; and the approximate direction of stormwater flow, including drainage areas, outfalls, and adjacent surface water bodies. *Id.*, Part IV.B.4.c.

59.    In addition, the SPPP must include the identity and responsibilities of a SPPP implementation team; a process-line diagram showing the processing of materials through the facility; an inventory of source materials; and schedules and procedures for regular inspections to verify that all BMPs are being appropriately implemented. *Id.*, Part IV.B.4.

60. Finally, as detailed further below, certain procedures and records must be kept with the SPPP for at least a five-year period, including but not limited to inspections logs, the Drainage Control Plan ("DCP"), and annual reports. *Id.*, Parts IV.B.4.f–i, J.1.

61. The Scrap Metal Permit requires that the SPPP "shall be made available to the public upon request." *Id.*, Part IV.B.2.d.

### iii. DCP Requirements

62. As noted above, the Scrap Metal Permit also requires permittees to develop and implement a Drainage Control Plan ("DCP"). First, permittees must develop an "Initial DCP" that describes how drainage control "will be accomplished," including a written narrative description, identification of monitoring locations, and an Initial Drainage Control Map. Scrap Metal Permit, Part IV.F.2.a–d. Then, the permittee must develop a "Final DCP" that describes how drainage control "has been accomplished," including a written narrative description, identification of monitoring locations, and a Final Drainage Control Map that is "legible" and "certified" by a licensed engineer. *Id.*, Part IV.F.3.a–d. The Initial DCP was required to be submitted to DEP by October 1, 2014. *Id.*, Part IV.F.2.e. The Final DCP was required to be submitted and implemented by October 1, 2015. *Id.*, Part IV.F.3.e–f.

63. The DCP and Drainage Control Map are "living documents" that must be "updated as necessary to reflect changes at the facility." *Id.*, Part IV.F.3.g.

64. The DCP ensures that all stormwater associated with the Facility's industrial activity is discharged through discrete, permitted outfalls (or infiltrates to ground water), and that all other discharges of stormwater (*i.e.*, sheet flow) are eliminated. *Id.*, Parts IV.A.1.a, IV.B.4.i., IV.F.1.a. The Scrap Metal Permit requires permittees to implement drainage control and drainage monitoring for all areas of industrial activity at a facility. *Id.*, Part IV.F.1.c.

65. To the best extent practicable, the DCP should prevent uncontrolled stormwater

16

discharges from migrating off-site through the use of berms, barriers, and other stormwater control measures. To the extent stormwater cannot be contained on-site, it must be channeled to a discrete outfall, which must be tagged and monitored pursuant to the terms of the Scrap Metal Permit. *Id.*, Parts IV.F.1.e, F.4.a–b.

### iv. Inspections, Monitoring, and Reporting

66.     The Scrap Metal Permit imposes a variety of facility and BMP inspection requirements, routine discharge monitoring, and schedules for submitting reports to DEP.

67.     First, the Scrap Metal Permit requires a permittee to conduct annual inspections of their facility to assess and evaluate the efficacy of the SPPP. The permittee must inspect all areas contributing to stormwater discharges; evaluate whether the SPPP and its stormwater and pollution controls are properly implemented; and determine whether additional controls are needed. By October 1 of each year, the permittee must prepare an annual report summarizing the inspection and, if any non-compliance is identified, the steps being taken to remedy the noncompliance. The permittee must then submit an annual certification to DEP that the inspection and report have been completed. The reports and certifications must be retained with the SPPP for at least five years. Scrap Metal Permit, Part IV.B.5.

68.     In addition, regular inspections of BMPs must be carried out at a facility at least quarterly. The inspections must be frequent and thorough enough to ensure that BMPs are being implemented and are functioning adequately. An inspection log of these regular inspections must be maintained in the SPPP for at least five years, verifying that all BMPs are in place and identifying any failures or breakdowns of BMPs. *Id.*, Part IV.B.4.f.

69.     The Scrap Metal Permit requires a permittee to monitor stormwater discharges from their facility, sample discharges, and submit reports to DEP. Permittees must collect and analyze stormwater samples for each outfall it has identified in its Drainage Control Plan.

Quarterly sampling is specifically required for all design criteria pollutants. *Id.*, Parts IV.A.1.e (citing Parts IV.F, G), G.2, G.3, J (summarizing reports to be kept on site and reports to be submitted to DEP).

70. The Scrap Metal Permit requires permittees to submit a quarterly discharge monitoring report ("DMR") to DEP within 25 days of the end of each quarterly monitoring period. *Id.*, Part IV.J.2.a.

### v. Design Criteria

71. As indicated above, the Scrap Metal Permit establishes "design criteria" that provide strong evidence of whether a facility has implemented the requisite control plans and BMPs sufficient to comply with the Scrap Metal Permit and the Clean Water Act.

72. Permittees must compare their facility's discharges' sampling results with the design criteria defined by the Scrap Metal Permit. If there are any exceedances of the design criteria, then the permittee should assess site conditions to identify any additional controls that could reduce stormwater contamination, and must summarize the remedial actions taken in the facility's Annual Report. Scrap Metal Permit, Part IV.G.4.b–c.

73. The Scrap Metal Permit's design criteria are $\leq 100$ mg/L for total suspended solids ("TSS"), $\leq 15$ mg/L for total petroleum hydrocarbons, $\leq 120$ mg/L for chemical oxygen demand, $\leq 0.75$ mg/L for aluminum, $\leq 0.0156$ mg/L for total recoverable copper, $\leq 1.0$ mg/L for total recoverable iron, $\leq 0.095$ mg/L for total recoverable lead, and $\leq 0.13$ mg/L for total recoverable zinc. *Id.*, Part IV.G.4.a.

74. In addition to monitoring design criteria, the Scrap Metal Permit requires permittees to monitor stormwater discharges for PCBs once per year to monitor the efficacy of the facility's inbound screening program (which prohibits materials likely to contain PCBs). *Id.*, Parts III, IV.C.1.a.

18

### vi. Duty to Mitigate

75.    All of these requirements are founded on a basic principle, which the Scrap Metal Permit imposes on all permittees: the duty to mitigate. Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)5, 11). The duty to mitigate is defined in two ways.

76.    First, "[t]he permittee shall take such corrective actions as required under the Federal and State Acts, and other relevant provisions of law, including, at a minimum, accelerated and/or additional types of monitoring, temporary repairs, ceasing discharge, or where ceasing discharge is not possible, other measures to mitigate the effects of violating its NJPDES permit." N.J.A.C. 7:14-6.2(a)11.

77.    The interweaving requirements detailed above—which fundamentally require permittees to make a plan, implement the plan, test the plan, and improve the plan as needed— set forth the framework within which permittees comply with their duty to minimize discharges of pollution from their industrial activities to waters of the United States.

78.    Second, "[a] permittee shall take all reasonable steps to minimize or prevent any activity in violation of its permit which has a reasonable likelihood of adversely affecting human health or the environment." N.J.A.C. 7:14A-6.2(a)5.

79.    The Clean Water Act, Section 307(a), 33 U.S.C. § 1317(a), requires the U.S. Environmental Protection Agency ("EPA") to maintain a list of toxic pollutants (the "307(a) Toxins List"). The States, including New Jersey, are required to adopt water quality criteria for all pollutants on the 307(a) toxic pollutants list. CWA § 303(c)(2)(B), 33 U.S.C. § 1313(c)(2)(B).

80.    The Scrap Metal Permit requires that permittees comply with all requirements incorporated by reference into the Permit, including but not limited to the New Jersey Administrative Code's sub-chapter "Conditions Applicable to All NJPDES Permits." N.J.A.C. Tit. 7, ch. 14A, sub-ch. 6.

81.     The Scrap Metal Permit, Part I.A.1.b, specifically incorporates that chapter's toxic pollutant requirements, N.J.A.C. 7:14A-6.2(a)(4)(i), which provides that "a permittee shall comply with . . . applicable effluent standards or prohibitions established under Section 307(a) and (c) of the [Clean Water Act] for toxic pollutants."

82.     The Scrap Metal Permit thus incorporates by reference EPA's 307(a) Toxins List.

83.     The 307(a) Toxins List currently includes copper, lead, zinc, and polychlorinated biphenyls ("PCBs"), amongst others. 40 C.F.R. § 401.15.

84.     New Jersey's water quality criteria for toxic pollutants set forth two narrative criteria for Class FW2 waters, such as the South Branch of the Rahway River. A waterbody must meet these numeric and narrative criteria to support its designated uses. *See* N.J.A.C. 7:9B-1.5.

85.     First, for toxic substances, there must be "[n]one, either alone or in combination with other substances, in such concentrations as to affect humans or be detrimental to the natural aquatic biota, produce undesirable aquatic life, or which would render the waters unsuitable for the designated uses." N.J.A.C. 7:9B-1.14(d)12.i.

86.     Second, toxic substances "shall not be present in concentrations that cause acute or chronic toxicity to aquatic biota, or bioaccumulate within an organism to concentrations that exert a toxic effect on that organism or render it unfit for consumption." N.J.A.C. 7:9B-1.14(d)12.iii.

87.      New Jersey's water quality criteria for toxic pollutants also set forth the following numeric criteria for FW2 waters, N.J.A.C. 7:9B-1.14(f)1, 2, 7:

a.     Lead must not exceed 38 micrograms per liter ("µg/L") on a one-hour average (acute) or 5.4 µg/L on a four-day average (chronic).

b.     Zinc must not exceed 113.8 µg/L on a six-hour average (acute) or 113.8 µg/L on a

four-day average (chronic), assuming a hardness value of 100 mg/L CaCO₃.

    c.      Copper must not exceed 12.71 µg/L on a 24-hour average (acute) or 8.47 µg/L on

a four-day average (chronic), assuming a hardness value of 100 mg/L CaCO₃.

    **E.**      **CWA Citizen Enforcement Suits**

    88.      Under CWA Section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may

commence a civil action in federal court on his own behalf against any person who is alleged to

be in violation of an "effluent standard or limitation" under the CWA.

    89.      Such enforcement action under CWA Section 505(a), 33 U.S.C. § 1365(a),

includes an action seeking remedies for an unpermitted discharge in violation of CWA

Section 301, 33 U.S.C § 1311, as well as for violation of a condition of a permit issued pursuant

to CWA Section 402, 33 U.S.C. § 1342. CWA Section 505(f), 33 U.S.C. § 1365(f).

    90.      Declaratory relief in such cases is authorized by 28 U.S.C. § 2201–02 (granting

U.S. courts the authority to issue declaratory relief in cases of actual controversy and grant

further necessary relief based on such a declaration).

    91.      Injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a).

    92.      Violators of the Clean Water Act are also subject to civil penalties for each

violation per day up to a statutory maximum (adjusted for inflation), currently $68,445. CWA

§§ 309(d), 505(a), 33 U.S.C. §§ 1319(d), 1365(a); 40 C.F.R. §§ 19.1–19.4.

**V.    STATEMENT OF FACTS**

    **A.**      **Metal Recycling Facilities**

    93.      Metal recycling facilities—especially those with outdoor stockpiling, processing,

and segregation of materials—have been identified as a major source of stormwater

contamination. Scrap metal in different stages of corrosion and decay may release a variety of

harmful substances, including but not limited to heavy metals, fuel, oil, lubricants, PCBs, grease,

lead acid, lead oxides, chlorinated solvents, asbestos, ethylene glycol, paint, and chemical

residues. 60 Fed. Reg. 50804, 50953–63, 51189–97 (listing common pollutants associated with

scrap and waste recycling facilities as of 1995 and outlining requirements for this industrial

sector); *see also Industrial Stormwater Fact Sheet Series—Sector N: Scrap Recycling and Waste

Recycling Facilities*, U.S. ENVTL. PROTECTION AGENCY, EPA-833-F-06-029 (Feb. 2021),

https://www.epa.gov/sites/default/files/2015-10/documents/sector_n_scraprecycling.pdf (listing

common pollutants associated with scrap and waste recycling facilities).

94.     In addition to the storage and processing of various sources of scrap metal, such

facilities also conduct vehicle operation and maintenance and equipment operation and storage.

Fork lifts, trucks, and other vehicles track debris, particulate matter, and other contaminants to

areas on and off the premises (known as "track-out pollution"). Vehicles also expose many other

sources of pollution to the elements, including gasoline, diesel fuel, anti-freeze, battery fluids,

and hydraulic fluids. *Id.*

**B.      Defendants' Facility and Industrial Stormwater Discharges**

95.     Defendants own and/or operate the Facility, a scrap metal processing and

recycling facility located at Block 772.02, Lots 618 and 7 (mailing address 95 Rodgers Street), in

Avenel, NJ 07001. The Facility occupies two parcels across Rodgers Street, at the intersection of

Rodgers Street and Leesville Avenue, as shown in the annotated Google Earth image attached to

the Notice Letter as Appendix A, incorporated herein by reference.

96.     The northeastern parcel, Lot 7, comprises the Facility's scrapyard. On the

northwestern half of Lot 7, the Facility processes vehicles into scrap metal and includes a vehicle

crusher. On the southeastern half of Lot 7, the Facility stockpiles different types of scrap metal.

Heavy machinery is located throughout the scrapyard.

97.     Lot 7's southwest perimeter is bordered by Rodgers Street and features two

driveways: Gate 1 from the vehicle processing area and Gate 2 from the scrap stockpile area. Lot 7 is bordered on its northwest by a steep slope down to Leesville Avenue and on its northeast by a railway (including railroad tracks raised by track ballast).

98.     The southern parcel, Lot 618, consists of a building, a scale on Rodgers Street, a paved lot on three sides of the building, and at least three driveways on Rodgers Street and Leesville Avenue.

99.     On information and belief, Defendants perform maintenance of industrial equipment and vehicles inside the building located on Lot 618.

100.     On information and belief, vehicle and equipment maintenance is an industrial activity.

101.     On information and belief, the Facility's scale (located on Lot 618) is used by Defendants to weigh scrap metal and other materials incoming and outgoing from the Facility's scrapyard and vehicle processing areas (located on Lot 7).

102.     On information and belief, the Facility's scale is associated with Defendants' industrial activities.

103.     In addition, Baykeeper has consistently observed uncovered and leaking dumpsters in the paved lot behind the building. On information and belief, these dumpsters are associated with Defendants' industrial activities, including scale operations and maintenance of industrial equipment and vehicles occurring on Lot 618.

104.     On information and belief, vehicles and equipment frequently travel between Lot 7 and Lot 618, for maintenance and/or use of the scale, tracking pollutants from Defendants' industrial activities across Rodgers Street and Leesville Avenue.

105.     Baykeeper has consistently observed track-out pollution and staining, in-person

and through review of publicly available imagery, on Rodgers Street between the Facility's Lots, on the Facility's driveways, and on and around the Facility's scale.

106.    On information and belief, areas of Rodgers Street and Leesville Avenue are utilized by Defendants as access roads to various areas of industrial activity on Lot 7 (scrap processing, sorting, and stockpiling) and Lot 618 (scrap inbound and outbound processing and vehicle and equipment maintenance) at the Facility.

107.    When it rains, the majority of stormwater from the Facility comes from, or is commingled with runoff from, areas at the Facility where Defendants' industrial activities occur, including Lot 7, Lot 618, and public roads used by Defendants as access roads.

108.    Stormwater flowing over areas in and surrounding the Facility that are associated with Defendants' industrial activities collects a variety of pollutants, including but not limited to metals; sizeable debris and sediment; oil and grease; organic substances and chemicals that create chemical oxygen demand; and other pollutants.

109.    Rodgers Street and Leesville Avenue have storm drains, which are part of the Woodbridge Township municipal separate storm sewer system ("MS4"). The MS4 discharges stormwater collected from these public roads, without treatment, to the South Branch of the Rahway River.

110.    Stormwater from the Facility thus discharges to the South Branch of the Rahway River by way of the MS4.

111.    The South Branch of the Rahway River is a water of the United States.

112.    DEP has classified the South Branch of the Rahway River as a Class FW2 waterway. N.J.A.C. 7:9B-1.15(e). A waterbody that is designated Class FW2 has the following designated uses: maintenance, migration, and propagation of the natural and established biota;

primary contact recreation; industrial and agricultural water supply; public potable water supply after conventional filtration treatment; and any other reasonable uses. N.J.A.C. 7:9B-1.12(c).

113.    The South Branch of the Rahway River is impaired for its designated uses for public water supply, fish consumption, and aquatic life. New Jersey has determined that the South Branch of the Rahway River does not meet state water quality standards for a number of pollutants, including total dissolved solids, PCBs, and mercury, amongst others.

C.    **Defendants' Scrap Metal Permit Coverage**

114.    Defendants have applied for and obtained coverage under the Scrap Metal Permit. Defendants' Scrap Metal Permit identification number is NJG0106399.

115.    Under the Scrap Metal Permit, Defendants are authorized to discharge stormwater into waters of the United States only through the single outfall, which DEP has identified in as DSN001A. Further, in annual and quarterly reports to DEP, Defendants only report monitoring for a single outfall.

116.    On information and belief, at Lot 7, Defendants collect stormwater from a trench drain (located at Gate 1) and a catch basin (located a couple yards north of the trench drain) and filter the collected stormwater with an oil-water separator.

117.    Defendants' Stormwater Improvements Plan proposes a third catch basin associated with Gate 2 that would direct flow via subsurface conveyance to the Gate 1 oil-water separator.  On information and belief, this catch basin either was never installed or is buried under stockpiled scrap metal, dirt, and other material such that it is non-functional. To the extent this catch basin exists, it is inadequate to collect and direct stormwater to the Gate 1 oil-water separator and is inadequate to prevent discharges through Gate 2 in all storm events.

118.    On information and belief, although Defendants' Stormwater Improvements Plan proposes a speed bump at Gate 2, this speed bump was either never installed or, since its

installation, has been eroded by heavy traffic such that it is non-functional. To the extent the speed bump at Gate 2 exists, it is inadequate to prevent discharges in all storm events.

119.    On information and belief, partially-treated industrial stormwater from the Gate 1 oil-water separator is discharged via sub-surface conveyance to the MS4 system on the corner of Rodgers Street and Leesville Avenue, then to the South Branch of the Rahway River.

120.    On information and belief, this stormwater conveyance is the Facility's sole permitted outfall, identified as DSN001A, and is the only outfall that Defendants have identified and monitor in quarterly and annual reports to DEP.

### D.    Defendants' Unpermitted Discharges

121.    On information and belief, Defendants discharge stormwater associated with industrial activity from unpermitted outfalls during precipitation events.

122.    First, the Facility has at least five driveways on its two Lots that discharge uncontrolled sheet flow.

123.    On information and belief, the trench drain located on Lot 7 at Gate 1 is inadequate to eliminate sheet flow in all precipitation events.

124.    On information and belief, any speed bump located on Lot 7 at Gate 2 is inadequate to eliminate sheet flow in all precipitation events.

125.    On information and belief, the Facility's other driveways do not have any controls in place to eliminate sheet flow from areas of industrial activity. In particular, the Lot 618 driveways located on Leesville Avenue are proximate to and downgradient from the building's bay doors, where maintenance of equipment and vehicles occurs.

126.    Baykeeper has consistently observed track-out pollution from all of the Facility's driveways and is thus informed and believes that all areas of the Facility (including Lot 7, Lot 618, and public roadways between that function as the Facility's access roads) are associated

with industrial activities.

127.    On information and belief, due to the slope of the Facility's Lots, as well as grading, paving, and/or structures on the Facility's Lots, stormwater associated with Defendants' industrial activities at the Facility is collected and conveyed along gradients across the Facility and discharges from the Facility's driveways to storm drains located on Leesville Avenue and Rodgers Street, through the MS4, to the South Branch of the Rahway River.

128.    Second, as discussed above, the Facility features a scale on Rodgers Street. The scale features no berms, drains, or other controls to eliminate sheet flow or otherwise control stormwater from the entrance and egress of the scale. To the extent that the sides of the scale have curbing, such curbing directs flow to the entrance and egress of the scale and/or is inadequate to retain stormwater in all precipitation events.

129.    On information and belief, Defendants discharge stormwater associated with Defendants' industrial activities from the scale to Rodgers Street and Leesville Avenue, through the MS4, to the South Branch of the Rahway River.

130.    Third, the Facility on both Lots is fenced only by chain-link fence and does not have any measures in place to contain, direct, or prevent stormwater from discharging at any point from the Facility's perimeter to Leesville Avenue and Rodgers Street.

131.    On information and belief, the Facility also does not have any measures in place to contain, direct, or prevent stormwater from discharging to the railway to the east of the Facility, which conveys Defendants' industrial stormwater (along or through the railway's track ballast) to Leesville Avenue.

132.    Defendants store tall piles of scrap and stacks of vehicles (crushed and uncrushed) immediately adjacent to these fences, with no controls in place to prevent stormwater from

contacting these materials and flowing directly (or indirectly, via the railway) to these public roads, through the MS4, and to the South Branch of the Rahway River.

133.    On information and belief, Defendants have failed to eliminate sheet flow from the Facility by channeling stormwater to discrete outfalls.

134.    On information and belief, Defendants do not have coverage under any NPDES permit for these discharges and have not had such coverage since at least October 1, 2020.

135.    On information and belief, Defendants have failed and are failing to monitor and report discharges from these locations since at least October 1, 2020.

136.    Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the Scrap Metal Permit, are set forth in the Notice Letter attached hereto as Exhibit A, Part II.A, Appx. B, and are incorporated herein by reference.

     **E.**    **Defendants Discharge Excessively Polluted Stormwater**

137.    Since at least October 1, 2020, Defendants have taken samples or arranged for samples to be taken of stormwater discharges from the Facilities, which were then reported to DEP (via written discharge monitoring reports or through DEP's electronic system for submission of discharge monitoring reports online). Defendants certified each of those reports pursuant to the Scrap Metal Permit.

      **i.**    **Design Criteria Exceedances**

138.    In these stormwater sampling results, the Facility has consistently reported high pollutant levels that exceed applicable design criteria, which constitutes evidence of ongoing violations of effluent limitations set forth in the Scrap Metal Permit.

139.    In the past five years, the Facility has reported numerous discharges of stormwater that exceeded the Scrap Metal Permit's design criteria, including total aluminum, total recoverable copper, total recoverable iron, total recoverable lead, and total recoverable

zinc—in other words, every metal the Facility is required to analyze its stormwater for by the Scrap Metal Permit. Further details related to these discharges, including specific dates of exceedances through the second quarter of 2025, are set forth in Exhibit A, tbl. 1, at 14–16, and are incorporated herein by reference.

140.    On information and belief, Defendants do not sufficiently treat the portion of the Facility's stormwater that is directed to its single, permitted outfall for metal constituents.

141.    In the third quarter of 2025, third quarter of 2024, and first quarter of 2023, Defendants reported "no discharge" in its quarterly monitoring report to DEC.

142.    Publicly-available precipitation data in the area of the Facility, retrieved from the United States National Oceanographic and Atmospheric Administration, is set forth in Appendix B to the Notice Letter, and is incorporated herein by reference.

143.    As shown in Appendix B and Table 1 of the Notice Letter, the Facility reported a discharge in the second quarter of 2025 when the maximum reported precipitation that quarter was 0.95 inches.

144.    As shown in Appendix B, a 1.26-inch storm event and a 2.13-inch storm event occurred in the area of the Facility in the third quarter of 2025.

145.    As shown in Appendix B, a 1.43-inch storm event occurred in the area of the Facility in the third quarter of 2024.

146.    As shown in Appendix B, a 1.24-inch storm event occurred in the area of the Facility in the first quarter of 2023.

147.    On information and belief, Defendants inaccurately reported "no discharge" from the Facility's sole permitted outfall during the third quarter of 2025, the third quarter of 2024, and the first quarter of 2023.

148.    On information and belief, had Defendants' discharges during the third quarter of 2025, the third quarter of 2024, and the first quarter of 2023 been monitored and reported as required by the Scrap Metal Permit, they would have shown exceedances of metal constituents consistent with those outlined in Table 1 of the Notice Letter, incorporated herein by reference.

149.    As noted above, the Facility is only monitoring one discharge location, where stormwater discharges are partially treated by an oil-water separator that filters stormwater to remove petroleum hydrocarbons, suspended solids, and other pollutants. The Facility's unpermitted and unmonitored discharges are not partially treated.

150.    On information and belief, the Facility's unpermitted and unmonitored discharges contain similar or even higher levels of pollutants. These discharges likely exceed the Scrap Metal Permit's design criteria for total petroleum hydrocarbons, total suspended solids, and chemical oxygen demand, because they are not partially treated by an oil-water separator.

151.    These design criteria exceedances are evidence of ongoing violations of the effluent limitations set forth in the Scrap Metal Permit, as detailed further below.

**ii.  Exceedances of Water Quality Criteria for Toxic Pollutants**

152.    Since at least October 1, 2020, the Facility has self-reported numerous one-time samples of stormwater containing lead, zinc, and copper that far exceed the acute and chronic numeric water quality criteria for lead, zinc, and copper in the South Branch of the Rahway River. Further details related to these discharges, including specific dates and locations of discharges, are set forth in Exhibit A, tbl. 3, at 24–25, and are incorporated herein by reference.

153.    On information and belief, these significant exceedances of acute and chronic numeric water quality criteria for lead, zinc, and copper, alone or in combination, are detrimental to the natural aquatic biota, produce undesirable aquatic life, and/or render these waters unsuitable for their designated uses.

30

154.    On information and belief, the concentrations of toxic substances reported by the Facility would cause acute or chronic toxicity to aquatic biota, or bioaccumulate within an organism to concentrations that exert a toxic effect on that organism, and/or render them unfit for consumption.

155.    As noted above, Defendants are only monitoring one location at the Facility that discharges stormwater partially treated by an oil-water separator, which filters stormwater discharges for petroleum hydrocarbons, suspended solids, and other pollutants. The Facility's unpermitted and unmonitored discharges are not partially treated.

156.    On information and belief, the Facility's unpermitted and unmonitored discharges contain similar or higher levels of toxic pollutants as compared to Facility's monitored outfall.

157.    On information and belief, stormwater discharges that are detrimental to aquatic wildlife, ecosystems, and/or a waterway's designated uses also adversely affect the environment.

158.    On information and belief, stormwater discharges that are detrimental to a waterway's designated uses for drinking water, recreation, fishing, or shellfishing have a reasonable likelihood of adversely affecting human health.

159.    On information and belief, since at least October 1, 2020, Defendants' stormwater discharges to South Branch of the Rahway River have had a reasonable likelihood of adversely affecting human health and/or the environment.

F.    **Defendants' Inadequate Pollution Prevention Practices**

160.    On information and belief, Defendants have failed and continue to fail to implement adequate pollution controls and BMPs at the Facility. Stormwater management practices at the Facility are inadequate to minimize and/or eliminate pollution in industrial stormwater discharged to the South Branch of the Rahway River.

161.    On information and belief, Defendants do not sufficiently treat the portion of the

31

Facility's stormwater that is directed to its single, permitted outfall for metal constituents. To the extent the trench drain and associated stormwater catchment system contain pollution control measures in addition to the oil-water separator, such measures are inadequate to prevent, minimize, or reduce exceedances of design criteria for metal constituents.

162.    The Facility lacks sufficient structural controls, such as grading, berming, roofing, containment, or drainage structures, to prevent precipitation and stormwater flows from coming into contact with exposed areas of industrial activity. The Facility also lacks sufficient structural controls to prevent the discharge of water once contaminated by industrial pollutants, or adequate stormwater pollution treatment technologies to treat stormwater once so contaminated.

163.    The Facility stores uncovered and uncontained material stacks and debris piles, and the scrap metal storage area in particular is routinely caked in thick mud, in violation of the Scrap Metal Permit requirement to clean all impervious surfaces at the end of each shift.

164.    Thick track-out of polluted mud from the Facility's scrap metal storage area is chronically found on Defendants' driveways, Defendants' scale, and the public roads surrounding and utilized by the Facility to move materials and equipment between its two Lots.

165.    In addition, Baykeeper has routinely observed uncovered dumpsters stored on Lot 618 leaking visibly polluted fluid. This indicates that Defendants are not controlling fluids and spills at the Facility.

166.    These observations of chronic pollution are evidence that Defendants are not instituting basic housekeeping measures to minimize contact of pollutants with stormwater.

167.    On information and belief, Defendants have failed and continue to fail to implement the basic housekeeping measures and site-wide pollution reduction BMPs required by the Scrap Metal Permit.

168.    Uncontrolled stormwater discharges from the Facility, as described above, is evidence that Defendants are not minimizing exposure of industrial activities to stormwater, in violation of the Scrap Metal Permit's pollution prevention requirements.

169.    For example, uncontrolled stormwater from the scrap metal storage area discharges from Gate 2 and the perimeters of Lots 7, in violation of the Scrap Metal Permit's requirement to minimize any runoff from scrap metal storage and stockpiling areas using permanent or semi-permanent covers, jersey barriers to contain stormwater, and other collection and containment methods.

170.    On information and belief, Defendants are also failing to comply with the Scrap Metal Permit requirement to inspect and reject incoming loads of scrap for materials likely to contain PCBs, as evidenced by Defendants' self-reporting of PCBs in their monitored stormwater discharges.

171.    On information and belief, Defendants have failed and continue to fail to implement mandatory BMPs for scrap metal processing and recycling required by the Scrap Metal Permit.

172.    In 2021, 2022, and 2023, DEP conducted inspections of the Facility and specifically advised Defendants that the chronic exceedances of design criteria could indicate violations of the Scrap Metal Permit and identified specific BMPs that Defendants should implement to ensure compliance. DEP requested that Defendants submit written reports detailing remedial measures to be implemented within 30 days of DEP's notice.

173.    On information and belief, Defendants did not implement the BMPs recommended by DEP in 2021, 2022, and 2023.

174.    Based on the inadequacy of pollution prevention practices; the repeated

exceedances of design criteria and water quality criteria; the visible pollution and sources of pollution observed surrounding the Facility; and DEP's inspections of the Facility, Baykeeper alleges that, since at least October 1, 2020, Defendants have failed to implement the BAT/BCT Standard at the Facility as required by the Scrap Metal Permit and the Clean Water Act.

### G.    Defendants' Inadequate Stormwater Pollution Prevention Plan

175.    On information and belief, Defendants have failed and continue to fail to implement an adequate Stormwater Pollution Prevention Plan ("SPPP") for the Facility.

176.    Defendant's long-standing failure to develop and implement an adequate SPPP is evidenced by the Facility's inadequate BMPs, discharges of excessively polluted stormwater, and unpermitted discharges of stormwater associated with Defendants' industrial activities, as described above.

177.    In Baykeeper's Notice Letter, Baykeeper requested a copy of Defendants' most recent SPPP, including the DCP. Defendants provided a SPPP last revised in March 2014.

178.    The 2014 SPPP does not set forth adequate site-specific BMPs or adequate structural control measures consistent with the BAT/BCT Standard for the Facility and necessary to meet the Scrap Metal Permit's requirement to minimize and/or eliminate discharges of polluted industrial stormwater. The 2014 SPPP recites BMPs that the Scrap Metal Permit requires permittees to consider, but fails to specify which BMPs will be implemented or how they will be implemented at this Facility.

179.    For example, as to scrap metal storage and stockpiling, the 2014 SPPP states that "any runoff from this area(s) must be minimized through measures such as [copying 6 options identified in Scrap Metal Permit]." The SPPP fails to identify the Facility's scrap metal storage and stockpiling area(s) and fails to describe the BMPs that will be utilized to minimize runoff in each such area. Furthermore, as detailed above, *supra* Part V.D, the Facility does not control

runoff from its scrap metal storage and stockpiling areas using any of those methods. Thus, even if the SPPP's recitation of BMPs were adequate, it has not been implemented at this Facility.

180.    The 2014 SPPP fails to include an adequate regular inspection protocol. Although the 2014 SPPP states that inspections should be performed quarterly, it fails to identify what will be inspected or how to evaluate whether such BMPs are performing as designed.

181.    The 2014 SPPP fails to include an inspection log.

182.    The 2014 SPPP has not been kept current to reflect changes at the Facility because remedial actions have not been made and/or have been inadequate to improve BMPs at the Facility, despite chronic exceedances since the SPPP was last revised in 2014.

183.    Furthermore, Baykeeper is informed and believes that the 2014 SPPP was not intended to serve as the Facility's permanent SPPP based on its own contents, which include "proposed" drainage control elements. Indeed, the 2014 SPPP states that: "During 2014, an updated topographic survey *will be* prepared along with a draft Drainage Control Plan for the site. In accordance with the [Scrap Metal] Permit, these *will be* completed by October 1, 2014." (emphasis added).

184.    On information and belief, Defendants never completed and implemented a final SPPP and have failed to keep the SPPP current to reflect changes at the Facility.

185.    Based on Defendant's unpermitted discharges; the inadequacy of pollution prevention practices and stormwater controls at the Facility; the repeated exceedances of design criteria and water quality criteria from the Facility's sole monitored outfall; the visible pollution and sources of pollution observed surrounding the Facility; DEP's inspections of the Facility; and the contents of the 2014 SPPP provided by Defendants in response to Baykeeper's request for the Facility's most recent SPPP, Baykeeper alleges that, since at least October 1, 2020,

Defendants have failed to develop and implement a SPPP at the Facility as required by the Scrap Metal Permit and the Clean Water Act.

### H.    Defendants' Inadequate Drainage Control Plan

186.    The 2014 SPPP contains a map of Lot 7 titled "Stormwater Improvements Plan," which proposes certain drainage control elements.

187.    On information and belief, Defendants never installed the controls proposed for Gate 2 or, if they were installed, they have since been removed, damaged, or buried such that they are nonfunctional.

188.    On information and belief, the "Stormwater Improvements Plan" was intended to serve as the Facility's Initial Drainage Control Map.

189.    The 2014 SPPP states, as to "existing conditions," that a Drainage Control Plan must be created and implemented "to bring the facility into full compliance."

190.    On information and belief, Defendants have never completed a Final Drainage Control Map for Lot 7.

191.    On information and belief, Defendants have never completed an Initial or Final Drainage Control Map for Lot 618.

192.    On information and belief, Defendants have never completed and implemented a Final Drainage Control Plan for the Facility.

193.    On information and belief, Defendants have failed and continue to fail to implement a DCP that ensures all stormwater associated with the Facility's industrial activity is discharged through discrete, permitted outfalls (or infiltrates to groundwater) and that all uncontrolled discharges of stormwater (*i.e.*, sheet flow) are eliminated. *See supra* Part D.

194.    On information and belief, the DCP does not contain an accurate site description and map, including identifying all stormwater flow paths and discharge locations.

195.    Based on Defendant's unpermitted discharges; the inadequacy of pollution prevention practices and stormwater controls at the Facility; and the contents of the 2014 SPPP provided by Defendants in response to Baykeeper's request for the Facility's most recent SPPP, Baykeeper alleges that, since at least October 1, 2020, Defendants have failed to develop and implement a DCP at the Facility as required by the Scrap Metal Permit and the Clean Water Act.

### I.    Defendants' Inadequate Inspection, Monitoring, and Reporting Practices

196.    On information and belief, Defendants have failed and continue to fail to comply with the Scrap Metal Permit's comprehensive monitoring, inspection, and reporting requirements.

197.    On information and belief, since at least October 1, 2020, Defendants have failed to conduct adequate annual inspections sufficient to determine that the Facility's SPPP did not comply and was not implemented in accordance with the Scrap Metal Permit or that additional and/or improved BMPs were needed to comply with the conditions of the Scrap Metal Permit.

198.    On information and belief, Defendants have failed and continue to fail to conduct the Scrap Metal Permit's required annual and quarterly inspections—or, if inspections were performed, have conducted such sub-par inspections as to fail to meet its minimum requirements.

199.    Based on Defendants' discharges of stormwater from unpermitted outfalls; the pervasive contamination of the areas surrounding the Facility; the chronic exceedances of design criteria and water quality criteria from the Facility's sole monitored outfall; and the inadequate inspection protocols set forth in the 2014 SPPP, Baykeeper alleges that, since at least October 1, 2020, Defendants have failed to adequately inspect the Facility as required by the Scrap Metal Permit and the Clean Water Act.

### J.    Defendants' Violations of Their Duty to Mitigate

200.    On information and belief, the above violations of the Scrap Metal Permit

triggered the duty to mitigate the effects of Defendants' violations by taking corrective actions.

201.    On information and belief, Defendants' repeated exceedances of the Scrap Metal Permit's design criteria over the course of many years, coupled with Baykeeper's observations of conditions at the Facility, demonstrate that Defendants have failed to take necessary corrective actions in order to mitigate the effects of the above violations.

202.    In addition, on information and belief, Defendants' exceedances of design criteria, coupled with exceedances of New Jersey's water quality criteria for toxic pollutants, evidence that Defendants' violations routinely cause discharges of pollutants at such excessive levels that they adversely affect the environment, or are reasonably likely to do so.

203.    Furthermore, on information and belief, Defendants' exceedances of New Jersey's water quality criteria for toxic pollutants evidence that Defendants' violations of the Scrap Metal Permit are reasonably likely to adversely affect human health for persons utilizing the River for drinking water, recreation, fishing, or shellfishing—all designated uses of the South Branch of the Rahway River.

204.    On information and belief, based on the continuation of these conditions over the course of many years, Defendants have failed to take all reasonable steps to minimize or prevent activities in violation of the Scrap Metal Permit at the Facility that have a reasonable likelihood of adversely affecting human health and/or the environment.

### K.    Stormwater Associated with Industrial Activity is Discharged from the Facility in Violation of the Scrap Metal Permit and the Clean Water Act

205.    As a result of the above acts and omissions, Defendants discharge excessively polluted stormwater associated with Defendants' industrial activities from the Facility to the South Branch of the Rahway River.

206.    Information available to Baykeeper indicates that Defendants have not fulfilled

the requirements set forth in the Scrap Metal Permit for discharges from the Facility due to the continued discharge of contaminated stormwater. Baykeeper is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuous.

207.    Further detailed facts, including additional detail on specific incidents and conditions that constitute violations of the Scrap Metal Permit, are set forth in the Notice Letter attached hereto as Exhibit A, and are incorporated herein by reference.

## VI.    CLAIMS FOR RELIEF

**FIRST CAUSE OF ACTION**
**Unlawful Discharge of Pollutants**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

208.    Baykeeper incorporates all preceding paragraphs as if fully set forth herein.

209.    The Clean Water Act, § 301(a), 33 U.S.C. § 1311(a), provides that the "discharge of any pollutant" by any "person" is unlawful, unless the discharge complies with various enumerated sections of the CWA. Among other things, Section 301(a) prohibits discharges not authorized by a valid NPDES permit issued pursuant to CWA Section 402, 33 U.S.C. § 1342.

210.    Defendants are only permitted to discharge stormwater through one outfall, as identified by DEP in its authorization for coverage under the Scrap Metal Permit.

211.    On information and belief, Defendants have discharged and continue to discharge stormwater associated with industrial activity from multiple unpermitted outfalls at the Facility on every day there has been at least 0.1 inch of precipitation since at least October 13, 2020.

212.    Each and every occurrence since October 13, 2020, of Defendants discharging stormwater associated with industrial activity without authorization under a NPDES permit is a separate and distinct violation of CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing and continuous.

213.    Continuing commission of the acts and omissions alleged herein irreparably harm

the waters of the United States, Baykeeper, and its members, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

214.    Wherefore, Baykeeper prays for relief as hereinafter set forth.

**SECOND CAUSE OF ACTION**
**Failure to Implement the Best Available and Best Conventional Treatment Technologies**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

215.    Baykeeper incorporates all preceding paragraphs as if fully set forth herein.

216.    The Clean Water Act, § 304(b)(2), (4), 33 U.S.C. § 1314, requires stormwater pollution control measures that reflect, and prohibits the discharge of pollutants above, the level that is commensurate with application of the BAT/BCT Standard.

217.    The Scrap Metal Permit implements the BAT/BCT Standard through its mandatory BMP requirements.

218.    The Scrap Metal Permit requires Defendants to develop, implement, update, and maintain mandatory site specific BMPs designed to minimize and/or eliminate the discharge of pollutants from the Facility. Scrap Metal Permit IV.A.1.b, B.1.a.ii, C, D, E.

219.    On information and belief, as of the filing date of this complaint, Defendants have not implemented adequate BMPs required by the Scrap Metal Permit.

220.    The failure to implement BMPs that meet the BAT/BCT Standard is evidenced by, amongst other things, the discharges containing pollution levels well in excess of the applicable design criteria, the unauthorized discharges of stormwater identified above, the exceedances of water quality criteria, the pervasive contamination of the areas surrounding the Facility, and DEP's inspections of the Facility in 2021, 2022, and 2023.

221.    Each and every day since October 13, 2020, on which Defendants operate the Facility without pollution controls equivalent to the BAT/BCT Standard is a separate and distinct

violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing and continuous.

222.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Baykeeper, and its members, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

223.    Wherefore, Baykeeper prays for relief as hereinafter set forth.

### THIRD CAUSE OF ACTION
**Failure to Develop, Implement, Update, and Maintain an Adequate SPPP**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

224.    Baykeeper incorporates all preceding paragraphs as if fully set forth herein.

225.    The Scrap Metal Permit requires permittees to develop, implement, update, and maintain a Stormwater Pollution Prevention Plan ("SPPP"). Scrap Metal Permit IV.A.1.a, B.

226.    The SPPP must identify potential sources of pollution that may affect the quality of stormwater discharges associated with the permittee's industrial activity.

227.    The SPPP must describe how the permittee has implemented BMPs to minimize and/or eliminate the discharge of pollutants in stormwater and to assure compliance with the other terms of the Scrap Metal Permit, including achievement of effluent limitations.

228.    The SPPP must establish a schedule for regular inspections of BMPs, to be carried out at least quarterly. The inspections must be frequent and thorough enough to ensure that BMPs are being implemented and are functioning adequately. A record of these inspections must be maintained in the SPPP, verifying that all BMPs are in place and identifying any failures or breakdowns of BMPs.

229.    Defendants have failed to develop and implement an adequate SPPP for the Facility. The inadequacy of the SPPP is evidenced by, *inter alia*, the unpermitted and uncontrolled discharges from the Facility, the pollutants evident in areas surrounding the

Facility, the inadequate stormwater control measures and BMPs at the Facility, the omission of Lot 618 from the SPPP, the contents of the 2014 SPPP as to Lot 7, DEP's inspections of the Facility, and by the Facility's continuing discharges of excessively polluted stormwater.

230.    Defendants have failed to update the SPPP for the Facility in response to the analytical results of the Facility's stormwater monitoring.

231.    Defendants have failed to conduct adequate inspections of sufficient frequency and in such conditions as to determine that existing BMPs are failing to minimize and/or eliminate discharges of pollutants in stormwater. Thus, on information and belief, Defendants' SPPP fails to set forth an adequate inspection schedule and procedures, or such inspection schedule and procedures are not being implemented at the Facility.

232.    Each and every day since October 13, 2020, upon which Defendants own and/or operate the Facility without an adequate SPPP for the Facility is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

233.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Baykeeper, and its members, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

234.    Wherefore, Baykeeper prays for relief as hereinafter set forth.

### FOURTH CAUSE OF ACTION
**Failure to Develop, Implement, Update, and Maintain an Adequate DCP**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

235.    Baykeeper incorporates all preceding paragraphs as if fully set forth herein.

236.    The Scrap Metal Permit requires permittees to develop, implement, update, and maintain a Drainage Control Plan ("DCP"). Scrap Metal Permit, Part IV.A.1.a, F.

237.    The DCP must ensure all discharges of stormwater, in all areas associated with industrial activity, are made via discrete, permitted outfalls and that all uncontrolled discharges of stormwater (i.e. sheet flow) are eliminated. *Id.*, Part IV.F.1.

238.    The Scrap Metal Permit required permittees to have a fully developed and implemented Final DCP on or before October 1, 2015, which must be updated as necessary to reflect changes at the facility. *Id.*, Part IV.F.3.e–g.

239.    Defendants have failed to develop and implement a Final DCP for the Facility. This failure is evidenced by, *inter alia*, the unpermitted and uncontrolled discharges from the Facility, the omission of Lot 618 from the "Stormwater Improvements Plan" contained in the 2014 SPPP, the presence of "proposed" stormwater controls in the "Stormwater Improvements Plan" that already exist at the Facility, and the presence of "proposed" stormwater controls in the "Stormwater Improvements Plan" that do not exist (or no longer exist) at the Facility.

240.    Defendants have failed to update the DCP for the Facility to accurately reflect the presence (or absence) of "proposed" stormwater controls.

241.    Each and every day since October 13, 2020, upon which Defendants own and/or operate the Facility without an adequate DCP for the Facility is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

242.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Baykeeper, and its members, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

243.    Wherefore, Baykeeper prays for relief as hereinafter set forth.

**FIFTH CAUSE OF ACTION**
**Failure to Conduct Adequate Inspections**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

244.    Baykeeper incorporates all preceding paragraphs as if fully set forth herein.

245.    The Scrap Metal Permit, Part IV.B.5.a, requires permittees to conduct annual inspections of the facility to assess compliance by October 1 of each year. Amongst other things, the annual inspection must evaluate whether the SPPP is implemented in accordance with the Permit and determine whether additional BMPs are needed to meet the Permit's terms.

246.    The Scrap Metal Permit requires permittees to prepare an annual report detailing the findings of the annual inspection, and to keep the annual report with the SPPP for at least five years. *Id.*, Parts IV.B.5.b, c, e. The annual report must also summarize any remedial actions taken in response to exceedances of design criteria. *Id.*, Part IV.G.4.c.

247.    Since at least October 1, 2020, Defendants have failed to conduct adequate annual inspections sufficient to determine that the Facility's SPPP and DCP did not comply and were not implemented in accordance with the terms of the Scrap Metal Permit.

248.    Since at least October 1, 2020, Defendants have failed to conduct adequate annual inspections sufficient to determine that additional or improved BMPs were needed to comply with the conditions of the Scrap Metal Permit.

249.    Since at least October 1, 2020, Defendants have failed to take remedial actions in response to significant repeated exceedances of design criteria.

250.    Defendants' failure to conduct adequate inspections is evidenced by, *inter alia*, the unpermitted discharges from the Facility's driveways and perimeters, the pollutants evident in areas surrounding the Facility, the inadequate stormwater control measures and BMPs at the Facility, the inadequacy of the Facility's SPPP and DCP, and by the Facility's continuing discharges of excessively polluted stormwater.

44

251.     Each inspection period since October 13, 2020 during which Defendants own and/or operate the Facility without conducting adequate annual inspections of the Facility is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a), 1342. These violations are ongoing and continuous.

252.     Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Baykeeper, and its members, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

253.     Wherefore, Baykeeper prays for relief as hereinafter set forth.

**SIXTH CAUSE OF ACTION**
**Failure to Mitigate Noncompliance with the Scrap Metal Permit**
**(Violations of CWA §§ 301, 402, 33 U.S.C. §§ 1311, 1342)**

254.     Baykeeper incorporates all preceding paragraphs as if fully set forth herein.

255.     The Scrap Metal Permit requires permittees to comply with all requirements incorporated by reference into the Permit, including but not limited to the New Jersey Administrative Code's sub-chapter "Conditions Applicable to All NJPDES Permits," N.J.A.C. Tit. 7, ch.14A, sub-ch. 6. Scrap Metal Permit, Part I.A.1.a.

256.     The Scrap Metal Permit incorporates the N.J.A.C.'s duty to take corrective action to cease or mitigate the effects of any permit violation. Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(11)).

257.     The Scrap Metal Permit incorporates the N.J.A.C.'s duty to minimize or prevent any permit violation that has a reasonable likelihood of adversely affecting human health or the environment. Scrap Metal Permit, Part I.A.1.b (incorporating N.J.A.C. 7:14A-6.2(a)(5)).

258.     On information and belief, Defendants have failed to take corrective action to cease or mitigate the effects of violations of the Scrap Metal Permit at the Facility.

259.     On information and belief, Defendants have failed to minimize or prevent

discharges of stormwater containing toxic substances—namely copper, lead, and zinc, alone or in combination—in such concentrations as to have a reasonable likelihood of adversely affecting humans and/or the environment.

260.    Defendants' failure to comply with the Scrap Metal Permit's duty to mitigate the effects of their noncompliance is evidenced by, *inter alia*, the repeated exceedances of design criteria and New Jersey's water quality criteria for toxic pollutants extending back to at least October 1, 2020, and the violations of the Scrap Metal Permit identified above, *supra* Part VI. First–Fifth Cause of Action.

261.    Each and every day since October 13, 2020, upon which Defendants own and/or operate the Facility while failing to comply with the Scrap Metal Permit's duty to mitigate requirements is a separate and distinct violation of the Scrap Metal Permit and CWA Sections 301(a) and 402, 33 U.S.C. §§ 1311(a) and 1342. These violations are ongoing and continuous.

262.    Continuing commission of the acts and omissions alleged herein irreparably harm the waters of the United States, Baykeeper, and its members, for which harm Baykeeper has no plain, speedy, or adequate remedy at law.

263.    Wherefore, Baykeeper prays for relief as hereinafter set forth.

## VII.    PRAYER FOR RELIEF

264.    Wherefore, Baykeeper respectfully requests that this Court grant the following relief, as allowed by 33 U.S.C. § 1365(a) and 28 U.S.C. §§ 2201(a) and 2202:

a.    Declare Defendants to have violated and to be in violation of the Clean Water Act as alleged herein;

b.    Enjoin Defendants from discharging pollutants from the Facility except as authorized by and in compliance with the Scrap Metal Permit;

46

c.  Enjoin Defendants from further violating the substantive and procedural requirements of the Scrap Metal Permit;

d.  Order Defendants to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendants to comply with the Scrap Metal Permit's inspection, monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

f.  Order Defendants to prepare a SPPP and DCP for the Facility consistent with the Scrap Metal Permit's requirements and implement procedures to regularly review and update the SPPP and DCP;

g.  Order Defendants to provide Baykeeper with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Clean Water Act and the Court's orders;

h.  Order Defendants to pay civil penalties of up to the statutory maximum per violation per day, pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1–19.4;

i.  Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.  Order Defendants to pay the costs of litigation, including Baykeeper's reasonable investigative costs, attorney fees, expert witness and consultant fees, and other costs, pursuant to CWA Section 505(d), 33 U.S.C. § 1365(d); and

k.  Award any such other and further relief as this Court may deem appropriate.

Dated this 12th day of December, 2025          Respectfully submitted,

New York, NY

By: _____

Julia Muench
SUPER LAW GROUP, LLC
222 Broadway, 22nd Floor
New York, NY 10038
*Attorneys for Baykeeper*